# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

———————————————————————— )
STEPHEN AGUIAR,                                      )
                                                     )
    **Plaintiff,**                                )
                                                     )
      **v.**                         )    **Civil Action No. 14-240 (ESH)**
                                                     )
DRUG ENFORCEMENT ADMINISTRATION, )
                                                     )
    **Defendant.**                              )
———————————————————————— )

## MEMORANDUM OPINION

Plaintiff Stephen Aguiar filed this action to challenge the Drug Enforcement Administration's ("DEA") response to his multiple Freedom of Information Act ("FOIA") requests for agency records related to its criminal investigation of him.  The Court granted summary judgment to the DEA.  *See Aguiar v. DEA*, 139 F. Supp. 3d 91 (D.D.C. 2015) ("*Aguiar I*"); *see also Aguiar v. DEA*, Civ. No. 14-0240, slip op., 2015 WL 7566661 (D.D.C. Nov., 24, 2015) (granting summary judgment on remaining issue).  On appeal, the United States Court of Appeals for the District of Columbia Circuit vacated the judgment and remanded the case for further proceedings on two issues:  (1) the DEA's denial of Aguiar's request for the GPS mapping software that was used to track his movements; and (2) the adequacy of the DEA's search for four administrative subpoenas.  *See Aguiar v. DEA*, 865 F.3d 730 (D.C. Cir. 2017) ("*Aguiar II*").  Before the Court are the DEA's Renewed Motion for Summary Judgment, Aguiar's Cross-Motion for Partial Summary Judgment, and Aguiar's Motion for Leave to File a Supplemental Complaint.

For the reasons set forth below, the Court grants in part the DEA's motion, because the

DEA has demonstrated that Aguiar is not entitled to GPS tracking software or new map images. The Court denies the DEA's motion as to the adequacy of its search for administrative subpoenas and orders the DEA to pursue the possibility that the agent who signed the subpoenas has information regarding their current whereabouts. The Court also denies Aguiar's motion to supplement his complaint.

## I.     BACKGROUND

In 2011, Aguiar was convicted in federal court in Vermont of conspiracy to distribute and distribution of cocaine. *See United States v. Aguiar*, Crim. No. 2:09-90 (D. Vt. Dec. 16, 2011), *aff'd*, 737 F.3d 251 (2d Cir. 2013). He is currently serving a 30-year prison sentence. *Id.* Between June 2013 and July 2014, Aguiar submitted multiple FOIA requests seeking information relating to the DEA's investigation of him.

### A.  Request for Administrative Subpoenas

Aguiar submitted his first FOIA request on June 6, 2013, seeking all DEA reports "regarding any investigation and all surveillance performed or conducted from March 1, 2009 through July 30, 2009" and all "reports memorialized by the Drug Enforcement Administration Asset Forfeiture Department." (Decl. of Katherine L. Myrick, Apr. 7, 2015, ECF No. 30-3 ("1st Myrick Decl."), Ex. A.) After some back-and-forth with the agency relating to the breadth of this initial request, in a letter dated August 1, 2013, Aguiar added a request for "any administrative subpoena form issued by any DEA Agent operating out of the Burlington, Vermont Regional Office between the dates of: December 19, 2008 and October 19, 2009 pertaining to [Aguiar's criminal case]." (*Id.* Ex. E.)

The DEA searched its Investigative Reporting and Filing System ("IRFS"). This system "contains <u>all</u> administrative, general and investigative files compiled by DEA for law

enforcement purposes." (1st Myrick Decl. ¶¶ 47-48.) The DEA then searched another index to identify four "investigative case files that mentioned plaintiff," two of which were relevant to the date range in Aguiar's FOIA requests. (*Id.* ¶ 57.) The DEA's Burlington Resident Office ("Burlington Office") was then "tasked with conducting a search" of those two files to identify "all investigative reports, administrative subpoenas, asset forfeiture and seizure records, and GPS data and images." (*Id.* ¶ 58.) The Burlington Office staff identified 338 pages of responsive materials, none of which included the four requested administrative subpoenas. (*Id.* ¶¶ 10, 58.) Among the documents identified were several administrative subpoenas, with dates ranging from January 9, 2009 to March 1, 2011, but the four administrative subpoenas Aguiar requested in his August 1 request were not located in the search. (*See Vaughn* Index, ECF Nos. 30-5, 30-6, 30-7, at 151-59.)

In a September 10, 2013 letter, the DEA notified Aguiar that in response to his June and July requests (its response did not expressly mention the August 1 request), it had located four files "pertaining to" Aguiar, "processed" the two files covering dates in the range of Aguiar's request, and identified 338 pages of responsive records, 106 pages of which were not subject in their entirety to FOIA exemptions and were therefore released to Aguiar with some redactions. (1st Myrick Decl. ¶ 10 & Exs. F, H.)

Aguiar believed that other administrative subpoenas existed and should have been produced. (*Id.* Ex. I.) He then filed an appeal with the Office of Information Policy ("OIP"), challenging the DEA's production as "incomplete." (*Id.*) On January 27, 2014, the OIP notified Aguiar that it was affirming the DEA's action, concluding that the DEA had "conducted an adequate reasonable search for [responsive] records." (*Id.* Ex. K.)

While Aguiar's appeal to the OIP was still pending, he submitted another request to the

DEA for all administrative subpoenas issued between December 19, 2008, and March 28, 2011, as part of the DEA's investigation of him. (*Id*. Ex. X.) After further correspondence with the agency, Aguiar submitted another FOIA request on April 28, 2014, for four specific administrative subpoenas:

1. One January 2009 DEA subpoena issued for my 617-549-2915 phone.
2. One March 2009 DEA subpoena issued for my Experian credit report.
3. One April 2009 DEA subpoena issued for my Equifax credit report.
4. One April 2009 DEA subpoena issued for my Trans-Union credit report.

(*Id*. Ex. BB.) On July 28, 2014, Aguiar sent a letter inquiring as to the status of this request (*id*. Ex. EE), but he never received a formal response from the DEA or copies of the records he had requested.

### B. Request for GPS Tracking Records

The other FOIA request at issue relates to the DEA's GPS surveillance of Aguiar. In August 2013, Aguiar submitted a request to the DEA for:

> [a] CD from DEA containing the DEA computer file of all tracking information collected via GPS devices attached to my vehicles with all images and proprietary software associated with that information from January 23, 2009 thru July 30, 2009, the very same file used by DEA to prepare exhibits for trial.

(*Id*. Ex. L.). Aguiar explained that he sought this information in order "to study and view the exact data and images DEA monitored while agents were tracking [his] vehicle(s)" and noted that he recalled that a DEA agent had at trial "prepared several images from his computer screen as he was tracking [Aguiar's] vehicle(s) on several different dates using DEA proprietary software that employs a Google mapping service." (*Id.*)

The DEA collects GPS tracking data by attaching to a vehicle a GPS transmitter, which "connects to satellites to determine the precise location of the vehicle," then sends that information "back to a computer where a DEA agent can see a vehicle icon moving on a map"

4

on his or her computer monitor.  (Def.'s Reply to Opp'n to Mot. for Summ. J., May 18, 2015,

ECF No. 33 ("Def.'s 1st Reply") at 8 (describing this process of collecting GPS data).)  The GPS

transmitter

> only sends data to the DEA computer when an agent 'pings' the transmitter.  The
> pings can be requested, or scheduled for every ten minutes, or turned off until
> needed, to save battery power.  When a ping happens, the computer system
> records the time, date, longitude, latitude and a vehicle description.  When queried
> the computer creates a table of the pings on a spreadsheet.

(*Id.*)

Initially, the DEA told Aguiar that it had identified and received from its Boston office a

potentially responsive CD containing GPS tracking information, but that "to process the CD,

DEA [would] require the services of an outside audio/video contractor."  (*Id.* Ex. O, at 2.)  The

DEA informed Aguiar that the estimated cost for this service, which Aguiar would have to pay in

advance, would be $608.25 ($8.25 for the reproduction and $600 for the post-production

editing/review).  (*Id.*)  Aguiar, who is incarcerated, was unable to pay that amount and requested

a waiver or reduction of these costs.  (*Id.* Ex. P, at 1.)  After further correspondence and litigation

about the fee, the DEA informed Aguiar that it had

> conducted a preliminary review of the CD in an effort to reduce the initial
> estimated fees.  After review of the CD, we learned that the CD contained
> formatted spreadsheets of the tracking data related to the subject of request.
> Given that many federal prisons prohibit the receipt of CDs by inmates, as a
> courtesy, we printed (in hardcopy format) all of the spreadsheets (without
> redactions) that we propose to release to you at no cost to you (free of charge).
> Further, be advised that with regard to your request for "*All images…*" no records
> were located related to any images.

(*Id.* Ex. Z, at 2.)

As described in its letter, the DEA provided to Aguiar 351 hardcopy pages of these

spreadsheets showing GPS coordinates.  After receiving the hardcopy spreadsheet pages, Aguiar

notified the DEA that in his opinion its production did not fully respond to his request.  (1st

Myrick Decl., Ex. D.)  He then appealed to OIP, arguing that the DEA should have provided him with a CD with the GPS data and the "compatible software used by agents of the DEA to track [his] movements."  (*Id.* Ex. AA.)  "In the alternative," Aguiar asked for

> an unredacted version of each and every GPS ping report displaying:  date, time, its corresponding geographical coordinates, altitude, speed, etc., including its corresponding satellite image plot on google maps at the lowest available altitude between 50-100 feet on the version of google maps in place at the time the GPS tracking of my vehicle(s) was performed by agents in 2009.

(*Id.* Ex. AA.)[1]  On September 30, 2014, the OIP closed the appeal without a decision due to this pending litigation.  (*See id.* Ex. FF (citing 28 C.F.R. § 16.9(a)(3) (2013)).)

**C.  Procedural History**

Aguiar initiated this litigation on January 13, 2014.  (Compl., Jan. 13, 2014, ECF No. 1.) On August 15, 2014, he amended his complaint.  (Am. Compl., Aug. 15, 2014, ECF No. 13.)  In the Amended Complaint, Aguiar specifically sought the four administrative subpoenas, as well as "each and every GPS ping report" from the DEA's surveillance of him, "with each and every GPS ping plotted on the version of Google maps in place [at the time of the surveillance]."  (*Id.* ¶¶ 8-10, 14).

The DEA moved for summary judgment, attaching as exhibits (1) a declaration of Katherine L. Myrick, Chief, Freedom of Information/Records Management Section for the DEA, (2) exhibits to that declaration comprising the correspondence between Aguiar and the DEA, and (3) a *Vaughn* Index.  (*See* Def.'s Mot. for Summ. J., Apr. 8, 2015, ECF No. 30 ("Def.'s 1st MSJ"); *see also* 1st Myrick Decl.)  Aguiar filed an opposition.  (Pl.'s Opp'n to Def.'s Mot. for

---

[1] The record is clear that Aguiar, who is incarcerated, has no means to create the maps himself. (*See* Pl.'s Opp'n to Def.'s Mot. for Summ. J., ECF No. 32, at 7 ("[A]s to the argument to simply plot the DEA-provided GPS points on maps, Plaintiff has no access to the internet, topographical maps, nor access to a computer unless it has to do with a legal issue. . . .").)

Summ. J., ECF No. 32 ("Pl.'s 1st Opp'n").)  The DEA replied.  (*See* Def.'s 1st Reply.)

The Court, finding that additional information was required to rule on the DEA's motion, ordered the DEA to supplement its declaration to demonstrate that an adequate search had been conducted for the four administrative subpoenas and to identify the "software used by the DEA to create images from the GPS tracking data, the nature of the DEA's license to use that software," and any applicable FOIA exemptions.  (Order, July 20, 2015, ECF No. 34.)  In a supplemental declaration, Myrick stated that Aguiar's request for the four subpoenas "was duplicative of his earlier requests" and the "previous searches would have uncovered <u>all subpoena</u> related information."  (Supp. Decl. of Katherine L. Myrick, ECF No. 36-1 ("2d Myrick Decl.") ¶ 11.)

As for the GPS software, the DEA informed the Court that the software used by DEA agents "belongs to the vendor and the DEA has no authority to provide the software to other persons for their personal use. . . .  The software remains under the control of the vendor and at no time does the Defendant exercise control of the software."  (Notice of Compliance with Court Order, Sept. 9, 2015, ECF No. 36, at 4.)  The Notice also explained that, "[a]t the time of the Plaintiff's trial, the software provided by the vendor allowed the DEA agent to produce a 'screen shot' of what was visible on the computer monitor.  Some of the screen shots contained a 'Google Maps' icon on the map image.'"  (*Id.* at 3.)  The GPS map images presented during Aguiar's trial were not systematically created or saved by the DEA as a function of using the mapping software.  (*See id.*)

The Court deferred ruling on the question of whether the GPS mapping software is an agency record subject to FOIA, and ordered the DEA to provide evidence, in the form of a sworn declaration, that supported the description provided in its legal briefing.  (*See* Order, Sept. 30,

2015, ECF No. 39.)  On all other questions, including whether the DEA had adequately searched for the administrative subpoenas and whether Aguiar was entitled to his alternative request of new map images, the Court granted summary judgment to the DEA.  (*See id.*; *Aguiar I*, 139 F. Supp. 3d 91.)

In response, the DEA filed another supplemental declaration by Myrick, in which she stated that the DEA "does contract for a service that allows for viewing the location of a GPS tracking devices [*sic*] on a geodetic map computer image," but that after searching the relevant "DEA field office, the GPS data associated with the surveillance of plaintiff was not located in the investigative case file or any computer in use at the DEA field office at the time of the search."  (Supp. Decl. of Katherine L. Myrick, Nov. 10, 2015, ECF No. 43-1 ("3d Myrick Decl.") ¶ 11).  The declaration also stated that "the field office that conducted the investigation and surveillance of plaintiff, and the DEA office responsible for the procurement of surveillance equipment and systems were contacted with regard to plaintiff's request," and, based on those inquiries, the DEA determined it "was not in possession or control" of the responsive software. (*Id.*)  Although this third declaration did not fully answer the Court's questions about the nature of the software itself, the Court was satisfied that the additional information provided was sufficient for the Court to determine that the software was not in the DEA's possession or control and therefore not an agency record.  *Aguiar v. DEA*, Civ. No. 14-0240, slip op., 2015 WL 7566661 at *1 (Nov. 24, 2015).  It accordingly entered summary judgment for the DEA.  (*See id.*)

Aguiar appealed.  After appointing counsel to file briefs and appear as amicus,[2] the Court

---

[2] *See Aguiar II*, 865 F.3d at 734.  Throughout this Memorandum Opinion, the Court attributes to Aguiar arguments made by his amicus, who has graciously continued to represent him on the issues remanded by the Court of Appeals.

of Appeals vacated the opinion, holding that the DEA had failed to meet its summary judgment burden on two issues: (1) whether it had conducted an adequate search for the administrative subpoenas, and (2) whether the GPS mapping software constituted an agency record. *See Aguiar II*, 865 F.3d at 740. The Court of Appeals declined to reach Aguiar's alternative request that the DEA provide him with images depicting the GPS tracking coordinates on maps. *See id.* at 737.

On remand, the DEA renewed its motion for summary judgment, filing with it a fourth declaration by Myrick and another by the agency's Infrastructure Support Unit Chief. (Def.'s Renewed Mot. for Summ. J., Dec. 18, 2017, ECF No. 87, & Mem. in Support, ECF No. 87-1 ("Def.'s Renewed Mot."); Third Supp. Decl. of Katherine Myrick, Dec. 18, 2017, ECF No. 87-4 ("4th Myrick Decl."); Decl. of Paul Roy, Dec. 18, 2017, ECF No. 87-3 ("Roy Decl.").) Aguiar opposed and filed a Cross-Motion for Partial Summary Judgment. (Pl.'s Cross-Mot. for Partial Summ. J. & Opp'n to Def.'s Mot. for Summ. J., Jan. 26, 2018, ECF No. 88, & Court-Appointed Amicus Curiae's Mem. in Support, ECF No. 88-1 ("Amicus Mot.").) The DEA replied, appending another declaration, this time by an attorney at the DEA with knowledge of the contract governing the DEA's use of its GPS mapping software. (Def.'s Reply to Opp'n to Mot. for Summ. J., Mar. 9, 2018, ECF No. 94 ("Def.'s Renewed Reply"); Decl. of William C. Little, Jr. & Exhibits thereto, Mar. 9, 2018, ECF No. 94-1 ("Little Decl.").) Aguiar replied. (Pl.'s Reply to Opp'n to Mot. for Partial Summ. J., Mar. 28, 2018, ECF No. 95 ("Amicus Reply").)

Also pending is Aguiar's *pro se* motion for leave to supplement his original complaint, which proposes to add new defendants, as well as new claims for monetary damages and declaratory relief under the Privacy Act. (*See* Pl.'s Mot. for Leave to File Supp. Compl., Aug. 21, 2017, ECF No. 75 ("Mot. to Supp."); Proposed Supp. Compl., Aug. 21, 2017, ECF No. 75-1.) The DEA opposed Aguiar's motion to supplement his complaint (Mem. in Opp'n to Mot. for

Leave to File, Oct. 13, 2017, ECF No. 83 ("Opp'n to Mot. to Supp."), and Aguiar replied. (Pl.'s

Reply to Opp'n to Mot. for Leave to File, Oct. 25, 2017, ECF No. 85 ("Reply Mot. to Supp.").)

## II.     LEGAL STANDARDS

### A.  Motion for Summary Judgment

To prevail on summary judgment, the moving party must establish that "there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." (Fed. R. Civ. P. 56(a).) The burden is on the moving party to demonstrate that there is an

"absence of a genuine issue of material fact" in dispute. *Celotex Corp. v. Catrett,* 477 U.S. 317,

323 (1986). "FOIA cases typically and appropriately are decided on motions for summary

judgment." *Georgacarakos v. FBI*, 908 F. Supp. 2d 176, 180 (D.D.C. 2012) (quoting *Defenders

of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009)). With respect to the

adequacy of an agency's search, summary judgment may be based solely on information

provided in the agency's supporting declarations. *See, e.g.*, *ACLU v. DOD*, 628 F.3d 612, 619

(D.C. Cir. 2011); *Students Against Genocide v. Dept. of State*, 257 F.3d 828, 838 (D.C. Cir.

2001).

### B.  Motion for Leave to File a Supplemental Complaint

On motion and with the court's permission, a party may supplement a pleading "setting

out any transaction, occurrence, or event that happened after the date of the pleading to be

supplemented." Fed. R. Civ. P. 15(d). Leave to file a supplemental complaint should be "freely

granted . . . where such supplementation will promote the economic and speedy disposition of

the controversy between the parties, will not cause undue delay of trial, inconvenience and will

not prejudice the rights of any other party." *Banks v. York*, 448 F. Supp. 2d 213, 214 (D.D.C.

2006) (quoting *Wells v. Harris,* 185 F.R.D. 128, 132 (D. Conn. 1999)).

# III.    ANALYSIS

## A.  Request for Administrative Subpoenas

The Court of Appeals held that the DEA was not entitled to summary judgment as to the adequacy of its search for the four administrative subpoenas requested by Aguiar.  It concluded that the DEA had (1) inadequately described how it searched within the two case files located in the Burlington Office, and (2) failed to explain why the search of an electronic system of case files was reasonably calculated to identify all relevant documents.  *See Aguiar II*, 865 F.3d at 738-39.  The Court of Appeals concluded that on remand the DEA would need to explain

> why the record system that it queried to produce the two files was the only one
> likely to contain the subpoenas.  And if the two were paper files, it will need to
> explain why it was unlikely that there were additional files, particularly electronic
> files, that could contain the subpoenas.  In sum, we conclude that the existing
> declarations were insufficient to explain:  (1) why the search within the two case
> files that the IRFS record system identified was reasonably calculated to find the
> subpoenas, and (2) why the DEA thought it reasonably likely that the requested
> subpoenas would only be found in case files maintained in IRFS.

*Aguiar II*, 865 F. 3d at 739-40.

### 1.  Search Within Case Files

The Court of Appeals found that the DEA's declarations failed to "disclose the search terms" used and the "type of search performed" within the files.  *Aguiar II*, 865 F.3d at 738 (quoting *DeBrew v. Atwood*, 792 F.3d 118, 122 (D.C. Cir. 2015)).  Specifically, the declarations suggested, without sufficient clarity, that the Burlington Office had conducted a manual, page-by-page search of physical documents in the two case files identified.  The Court's decision states that "if that is so, it would of course resolve the matter, and the agency can say so in a new declaration filed with the district court.  If the files were not susceptible to a manual search of every page, however, and particularly if they were electronic, then more will need to be said about the manner of the search," *i.e.*, search terms and the type of search performed.  *Id.* at 739.

On remand, the DEA provided an additional declaration addressing the gaps identified by the Court of Appeals. Myrick confirms that the Burlington Office manually reviewed hard-copy files. Myrick's declaration states: "The [Burlington Office] maintains hard-copy paper investigative case files. Members of the [Burlington Office] manually searched the two (2) files identified by [an electronic index search] for all investigative reports and documents that mentioned or related to plaintiff." (4th Myrick Decl. ¶ 14; *see also id.* ¶ 6 ("Administrative subpoenas issued during the course of a DEA investigation are in hard-copy paper form and maintained in the investigative case file associated with the investigation. DEA does not maintain duplicates of administrative subpoenas in any other files or filing system; or in an electronic format in any system. . . .").) These additional details "resolve the matter." *Aguiar II*, 865 F.3d at 739. They establish that, consistent with the requirements outlined by the Court of Appeals, the manual search by Burlington Office staff of the two paper case files was adequate.

### 2. Search of Electronic System of Case Files

The Court of Appeals also found the DEA's declarations inadequate in that "they do not explain why the only reasonable place to look for the subpoenas was in case files maintained in the IRFS system." *Aguiar II*, 865 F.3d at 739. While the DEA did adequately explain how the system was searched to identify the two files, it did not demonstrate that the search of the system was "reasonably calculated to uncover all relevant documents." *Id.* (quoting *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)). Rather, Myrick provided the conclusory assertion that "no other record systems are reasonably likely to contain" the subpoenas, without saying why that is so. *Id.* (quoting 1st Myrick Decl. at 17). The Court of Appeals noted in its discussion that, although not dispositive, the failure to identify four subpoenas whose existence is not in dispute could indicate that the search was not reasonably calculated to uncover those

documents. *Id.* (citing *Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003)).

In her new declaration, Myrick again explains that, because IRFS files "contain <u>all</u> administrative, general and investigative files compiled by DEA for law enforcement purposes," any administrative subpoenas were reasonably likely to be identified in such a search. (4th Myrick Decl. ¶ 5.) She further states that "there is no system of records maintained by DEA that tracks and/or in which copies of administrative subpoenas are maintained. All copies of all administrative subpoenas issued by DEA during the course of a DEA investigation are maintained in the DEA investigative case file associated with the investigation," in paper copy form with no duplicates saved elsewhere. (*Id.* ¶ 6.) Administrative subpoenas "are systematically included in investigative case files." (*Id.* ¶ 8.) Although the record before this Court and before the Court of Appeals included statements from Myrick suggesting this information (1st Myrick Decl. ¶ 48 ("IRFS contains <u>all</u> administrative, general and investigative files compiled by DEA for law enforcement purposes.")), the Court of Appeals found those previous declarations too "sparse" in their explanations of *why* searching those indices was reasonably likely to disclose all relevant information. *Aguiar II*, 865 F.3d at 739.

Myrick's latest explanations provide the missing details. There is no DEA system that tracks all administrative subpoenas; rather, those subpoenas are stored as paper copies in the hard-copy case files. (*See* 4th Myrick Decl. ¶ 6.) These were the files searched, via electronic index, for potentially relevant files. (*Id.*) Two relevant files were identified based on Aguiar's identifying information and the date range he specified in his request. (*Id.* ¶¶ 10-12.) Burlington Office staff then manually searched those files. (*Id.* ¶ 14.) Although the subpoenas, whose existence is not in dispute, were not found, the Court is persuaded that the search was diligent

and reasonably likely to turn up any relevant records.

Aguiar agrees that Myrick's most recent declaration "remedies the two deficiencies identified by the Court of Appeals," but argues that the search was still inadequate because the DEA has not contacted Justin Couture, the DEA case agent who signed the subpoenas and testified about them at Aguiar's pre-trial hearing.  (Amicus Mot. at 23.)  Aguiar argues that "there is a close nexus" between Agent Couture and the subpoenas, and therefore the DEA should have "inquire[d] of him as a source likely to turn up the information requested."  (*Id.* at 24 (quoting *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 328 (D.C. Cir. 1999)).)

Aguiar made this argument previously, but the Court of Appeals dismissed it in a footnote because Aguiar had not previously suggested to the agency or to the Court that Agent Couture should have been contacted.  As the Court of Appeals noted, an agency need only look to "the four corners" of a FOIA request for leads as to agency records.  *Aguiar II*, 865 F.3d at 740 n.1 (quoting *Kowalczyk v. DOJ*, 73 F.3d 386, 389 (D.C. Cir. 1996)).  Aguiar argues that he has now remedied this problem by writing to the DEA following the decision on appeal and asking the DEA to contact Agent Couture for information about the whereabouts of the subpoenas.  (*See* Amicus Mot. at 24; *see also* Attach. to Notice to Court at 4.)  The DEA characterizes the proposed inquiry as "futile," because neither Agent Couture's signature on the subpoenas nor his testimony about them several years ago amounts to a guarantee that he would point the agency to the records' current whereabouts.

The DEA must pursue a lead to missing documents if that lead is "both clear and certain" and cannot "in good faith" be ignored.  *Kowalczyk*, 73 F.3d at 389.  An agency need not "speculate about potential leads," *id.*, but a failure to follow reasonable leads can render a search inadequate.  *See, e.g.*, *Valencia-Lucena*, 180 F.3d at 328 (holding that the agency should have

contacted the captain of a ship whose logbooks were sought, because "[i]t is entirely possible that [he] would recall what he did with the logbook after he testified at trial"); *Campbell v. DOJ*, 164 F.3d 20, 28 (D.C. Cir. 1998) ("An agency has discretion to conduct a standard search in response to a general request, but it must revise its assessment of what is 'reasonable' in a particular case to account for leads that emerge during its inquiry.").

Although, as the Court of Appeals notes, Aguiar did not identify this potential lead in his original FOIA request, he has identified it now and has specifically asked the DEA to contact Agent Couture to ask if he remembers what he did with the subpoenas or knows where they may be. (*See* Notice to the Court, Oct. 10, 2017, ECF No. 84 (notifying the Court that Aguiar made this request to the DEA following the issuance of the Circuit's opinion and including a copy of his letter).) The DEA asserts that such an inquiry would be "futile." This assessment is insufficient. Success need not be guaranteed to warrant follow-up. The subpoenas' existence is uncontested, and the agency did not find them in the files where they should have been stored. It is not merely speculative, and indeed seems reasonable, to suppose that Agent Couture may recall that the subpoenas were stored in a different type of file or some other location, and the DEA should make a good-faith effort to reach him to pursue this lead. The Court therefore orders the DEA to do so.

**B.  Request for GPS Tracking Records**

In response to Aguiar's August 2013 FOIA request for "all tracking information collected via GPS devices attached to [his] vehicles," and "all . . . proprietary software associated with that information," the DEA eventually provided a copy of spreadsheets listing latitude and longitude coordinates captured by GPS. Aguiar then renewed his request for a copy of the software itself or, in the alternative, for images of the coordinates plotted onto satellite maps. The DEA denied

this request because the agency "was not in possession or control of any system or software that was responsive to [Aguiar's] request." (3d Myrick Decl. ¶ 8.)

On appeal, the D.C. Circuit found Myrick's third declaration insufficient because it relied on conclusory legal assertions rather than explaining "as a matter of fact that the software was not found." *Aguiar II*, 865 F.3d at 736. Specifically, the DEA failed to "explain where the software is located, what arrangement it has with the software's creator, how it uses the software, and why those circumstances amount to something short of obtaining and controlling the software." *Id.* at 737. On remand, this Court has been directed to assess the new information provided by the DEA and to determine whether material questions of fact remain as to the software.

Now before the Court are new declarations in support of the DEA's renewed motion for summary judgment. The Roy Declaration explains that from 2004-2011 the DEA used a computer system "that permitted a user to view the location of GPS tracking devices in real-time on a mapping display." (Roy Decl. ¶¶ 16, 18.) The software was installed on DEA-owned laptops, and "end users," in this case DEA employees, would use the system to review real-time locations on a map. (*Id.*) The system "did not allow for the manual entering of discrete longitude and latitude coordinates for display on a map." (*Id.* ¶ 16.)[3]

In addition to these details about how the system worked, the DEA also provided, with its reply brief, a declaration from one of its attorneys and relevant portions of the license agreement governing its use of the software in question; the agreement incorporates federal regulations

---

[3] Since 2011, the DEA has used a completely web-based interface for real-time GPS tracking, and when the agency changed systems, "all end-user software and equipment" associated with the old system was "retired and disposed of." (*Id.* ¶ 18.) By the time Aguiar submitted his original FOIA request in 2013, the DEA had switched to the new system and no longer maintained the software from the previous system.

providing that copies of the software may not be distributed to the public. (*See* Little Decl.)

These documents provide the factual details that the Court of Appeals found lacking: the DEA has now explained "where the software is located" (it was downloaded to DEA machines during the years it was in use), the "arrangement [the DEA] has with the software's creator" (permission to use but not to distribute to the public), and "how it use[d] the software" (to view GPS locations on real-time map images). *Aguiar II*, 865 F.3d at 737. The documents and explanations also describe significant limitations on the DEA's use of the software, most notably that the contract prohibits its distribution. The Court is satisfied that the DEA did not "obtain" and "control" the software because the limited terms of the license establish no "intent" to retain control over it, the agency was limited in its use of the software, and the software itself was downloaded to agency machines but was not "integrated into the agency's record system." *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 217 (D.C. Cir. 2013) (setting forth factors for determining whether there is agency control of a document) (quoting *Tax Analysts v. DOJ*, 845 F.2d 1060, 1069 (D.C. Cir. 1988), *aff'd on other grounds*, 492 U.S. 136 (1989)). In his reply, Aguiar agrees that the DEA "has finally provided information about its license" to use the software, and it has now established that Aguiar is not entitled to the software itself. (Amicus Reply at 1.)

Aguiar contends, however, that he is entitled to his alternative request for images showing the GPS coordinates plotted on maps. This Court previously held that the DEA is not required to produce new map images because FOIA "does not obligate agencies to create or retain documents; it only obligates them to provide access to those which it in fact has created and retained." *Aguiar I*, 139 F. Supp. 3d at 101 (quoting *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 152 (1980)). The Court of Appeals declined to reach this

17

argument. *See Aguiar II*, 865 F.3d at 737 ("[R]eaching Aguiar's fallback request today would be premature. If the district court again enters judgment against Aguiar, he can bring another appeal.").

Aguiar now contends that the map images he seeks would not be new records but merely another "form or format" of the GPS tracking coordinates that the DEA has already provided as responsive. FOIA requires that "an agency shall provide the record in any form or format requested by the person if the record is readily reproducible by the agency in that form or format." 5 U.S.C. § 552(a)(3)(B). This provision requires an agency to, for example, produce records in electronic format as opposed to hard copy if that is the requestor's preference. *See Sample v. Bureau of Prisons*, 466 F.3d 1086, 1088 (D.C. Cir. 2006). Aguiar argues that creating maps amounts no more than to presenting the relevant data "in an understandable form without altering their substance." (Amicus Mot. at 21.) The DEA does not dispute that map images are "readily reproducible." But it argues that the "record" at issue here is the GPS coordinate data in the spreadsheets that were already produced to Aguiar. The DEA argues that different forms or formats within the meaning of the statute would include, for example, "a native Microsoft Excel file, an electronic PDF, or a print-out of the spreadsheet on paper." (Def.'s Renewed Reply at 6.)

FOIA imposes no duty to create new records. *See Kissinger*, 445 U.S. at 152. The statute also does not require agencies to create explanatory materials or augment existing records to make them more comprehensible. *See NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 161 (1975) ("Nor is the agency required to identify, after the fact, those pre-existing documents which contain the 'circumstances of the case' to which the opinion may have referred, and which are not identified by the party seeking disclosure."). At the same time, it is also clear that an agency must provide records in any form or format requested, so long as they are "readily

reproducible" in that format.  5 U.S.C. § 552(a)(3)(B); *see, e.g.*, *Sample*, 466 F.3d at 1088;

*Scudder v. CIA*, 25 F. Supp. 3d 19, 34-35 (D.D.C. 2014) (noting that an agency must release

records in any form or format requested, even if the records do not already exist in the requested

format).

   Typically, cases analyzing the "form or format" provision have considered the agency's

obligation to produce records in different types of electronic formats as opposed to hard copy (or

vice versa).  *See, e.g.*, *Sample*, 466 F.3d at 1088 (holding that FOIA required production of

records in electronic format, as requested, even though paper copies had already been provided).

On the whole, the "form or format" provision of § 552(a)(3)(B) appears to have been crafted

with these types of electronic-versus-paper distinctions in mind.  *See* H.R. Rep. 104-795, Pub. L.

104-231 (Sept. 17, 1996) at 22-23 ("This section requires agencies to help requestors by

providing information in the form requested, including requests for the electronic form of

records. . . .  This section also requires agencies to make reasonable efforts to search for records

kept in an electronic format.").

   Courts have, on occasion, grappled with "form or format" questions that are variations on

the theme presented here.  The Tenth Circuit has held that FOIA did not require the Department

of Labor to provide printouts from a computer scheduling program, because the agency did not

create or maintain screen shots from its scheduling software.  *Brown v. Perez*, 835 F.3d 1223,

1237 (10th Cir. 2016).  The agency did provide "various redacted reports generated by its

scheduling software," including some of the relevant information that had been requested, but

the plaintiffs wanted to see how the scheduling menus would appear on users' screens.  *Id.* at

1229.  The Tenth Circuit held that the agency did not need to "open the software, input the

relevant data, and recreate a screen image that could be captured and produced."  *Id.* at 1237; *see*

*also Gabel v. C.I.R.*, 879 F. Supp. 1037 (N.D. Cal. 1994) ("The government's responsibility under FOIA is to release specified documents unless a FOIA exception covers the documents; it is not to revamp documents or generate exegeses so as to make them comprehensible to a particular requestor.").[4]

To support his more expansive reading of the statute, Aguiar points to a Third Circuit opinion where the court stated in dicta that "translated" versions of encoded documents subject to release under FOIA would not "be tantamount to imposing on the Government the burden of creating records." *McDonnell v. United States*, 4 F.3d 1227, 1244 (3d Cir. 1993). Although somewhat analogous, the Third Circuit's commentary on "translations" of encoded documents does not apply to Aguiar's case. Because the documents at issue were protected by an exemption under FOIA, the *McDonnell* court did not need to reach the "translation" issue. *Id.* Rather than engaging in a full analysis of the "form or format" question, the *McDonnell* court noted that the agency had a policy of creating and maintaining "translations" of encoded documents as a matter of course; this existing agency practice was a significant factor in the court's supposition that providing such "translations," perhaps earlier than the agency would normally have created them, would not be creating a new record under FOIA. *Id.* In any case, it appears that in the D.C. Circuit there is no FOIA requirement to translate a record into a different language. *See Essential Information, Inc. v. U.S. Information Agency*, 134 F.3d 1165, 1172

---

[4] The Court recognizes that if Aguiar had access to the Internet he could enter the GPS coordinates into a mapping program (such as Google maps) to create the images himself, but due to his incarceration he is unable to do this. (*See* Pl.'s 1st Opp'n at 7 (describing computer access limitations); *see also supra* note 1.) However, issues of access due to prison restrictions do not bear on an agency's obligations under FOIA. *See Sample*, 466 F.3d at 1089 ("Once BOP, in its role as FOIA respondent, has provided the records, its FOIA obligation is complete. If BOP—in its role as [plaintiff's] custodian—then decides to limit or prohibit access to the material, any question raised by that decision is not before us.").

(D.C. Cir. 1998) (Tatel, J., dissenting on other grounds) (noting that, in comparison with another statute, "FOIA contains no . . . translation requirement").

The map images Aguiar seeks would involve the addition to the GPS "ping" data of explanatory material in the form of geographical locations, streets, as well as other new information such as the Google maps logo and Google formatting styles and conventions. FOIA does not obligate the DEA to create new explanations to render the requested records more comprehensible. *See Sears, Roebuck*, 421 U.S. at 161. Moreover, creating the maps would involve inputting data into a computer program to generate thousands of individual map images. (*See* 1st Myrick Decl., Ex. AA (Aguiar describing his request that the DEA superimpose "each and every GPS ping report" on a map image).) The multiple steps between the spreadsheets and the requested images—opening some sort of mapping software, inputting the data from 351 pages of spreadsheets, and generating a new map image for each "ping"—strongly suggests that the output would not be a straightforward reproduction of the spreadsheets, but a new record with significant added meaning. *Compare Brown v. Perez*, 835 F.3d at 1237 (holding that FOIA did not require the Department of Labor to "open the software, input the relevant data, and recreate a screen image that could be captured and produced"), *with McDonnell* (emphasizing the agency's existing practice of creating the "translations" in question).

The Court need not reach the question of whether the requested map images are "readily reproducible," because they are not "reproducible" at all—they are not a different form or format of the GPS coordinates, but would constitute new records, or at least augmented records with new explanatory information. Therefore, the Court reaffirms its prior holding that FOIA does not obligate the agency to create new map images using the GPS coordinate data.

### C. Aguiar's Proposed Supplemental Complaint

In addition to the arguments made by his amicus on his motion for partial summary judgment, Aguiar moves *pro se* to supplement his complaint against the DEA. (*See* Proposed Supp. Compl.; *see also* Order, Sept. 29, 2017, ECF No. 80 (reinstating Aguiar's motion for leave to file a supplemental complaint).) Aguiar seeks to add as a defendant the "unknown U.S. DOJ GPS contractor" (the "Contractor"), who Aguiar alleges intentionally created and disclosed inaccurate agency records. (Proposed Supp. Compl. at 1-2.) He also proposes to add as a defendant the Executive Office for U.S. Attorneys ("EOUSA") because it allegedly maintains "inaccurate agency records about [Aguiar] in its system of records," which may harm Aguiar's ongoing or future litigation. (*Id.* at 2.) Against these three defendants, Aguiar seeks to add six counts of Privacy Act violations, which he claims resulted in his losing past and future income due to his incarceration in excess of $600,000. (*See id.* at 9-11.)

Specifically, Aguiar alleges that, during his trial in 2011, DEA Special Agent Richard Carter presented data purporting to represent Aguiar's movements for the period January 23 through May 14, 2009, even though the GPS tracking unit number associated with the data had "malfunctioned and was no longer operational" as of January 30, 2009. (*See id.* ¶¶ 8, 14 (referencing "GPS unit no. pt3k:5712681012).) Aguiar also proposes to add claims related to the accuracy of the DEA's descriptions of its use of GPS surveillance software. He alleges that Agent Carter inaccurately described the GPS software as a "DEA system" and one that "we maintain." (*Id.* ¶ 13.) Aguiar further alleges that the DEA delayed revealing that it did not possess or control the software system at issue, but rather contracted with a third party for its use, and that the Contractor's server saved the GPS data and could "replay[]" it "at will." (*Id.* ¶¶ 26-27 (referencing Myrick's November 2015 supplemental declaration).) The DEA also allegedly

initially withheld the fact that it had located Aguiar's GPS records not in its own records or files but rather those of the U.S. Attorney's Office. (*Id.*)

A party may supplement a pleading "setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d). "A district court may deny a motion to amend a complaint as futile if the proposed claim would not survive a motion to dismiss." *Hettinga v. United States*, 677 F.3d 471, 480 (D.C. Cir. 2012) (affirming denial of leave to file a supplemental complaint) (citing *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996)). Because Aguiar's motion to supplement his complaint is filed *pro se*, the Court construes it liberally. *See, e.g.*, *Toolaprashad v. BOP*, 286 F.3d 576, 583 (D.C. Cir. 2002).

Aguiar seeks to supplement his complaint with new claims under the Privacy Act of 1974, which was enacted to respond to concerns about the government's use of personal information. *See* Pub. L. No. 93-579, § 2(a), 88 Stat. 1896 (1974). The Act places obligations and limitations on federal agencies related to the collection, maintenance, use, and dissemination of information about individuals that is maintained in systems of agency records. *See* 5 U.S.C. § 552a. Among these is the requirement that "[e]ach agency that maintains a system of records shall . . . upon request by any individual to gain access to his record or to any information pertaining to him which is contained in the system, permit him . . . to review the record," subject to certain exemptions. *See* 5 U.S.C. 552a(d)(1).

Proposed Count One accuses the DEA and the Contractor of "improperly withholding and/or concealing and/or destroying Mr. Aguiar's GPS agency records which were required to be archived, maintained, and produced upon request." (Proposed Supp. Compl. at 9.) This claim apparently references the agency's handling of Aguiar's FOIA request for GPS tracking software

and maps. (*Id.* ¶¶ 25-27 (alleging that the Contractor saved GPS data on its server), ¶ 14 (describing the spreadsheets containing data collected from each "ping").) The Court has explained why the GPS software is not an agency record. To the extent that Aguiar is entitled to the GPS data, that data has been provided in the form of spreadsheets, satisfying the DEA's FOIA obligation. Proposed Count One is premised on the alleged withholding of materials that are either not agency records or have already been provided; it is therefore futile.

Proposed Counts Two and Three allege that the DEA misled Aguiar about its search for GPS records, the origin of those records, and the "existence, identity, and role" of the Contractor. (Proposed Supp. Compl. at 9.) The Privacy Act obligates an agency to provide an individual access to one's "own records." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1121 (D.C. Cir. 2007). Counts Two and Three allege that the DEA made misleading statements about its use of GPS software, but these claims do not allege that access to the records themselves was improperly restricted. These allegations therefore are not cognizable Privacy Act claims.

Proposed Counts Four and Five allege that the DEA and Contractor created or disclosed inaccurate GPS records to one another and to the EOUSA, and that the EOUSA maintained these inaccurate records in its systems. (Proposed Supp. Compl. at 9-10.) The DEA argues that these claims "improperly attempt to use the Privacy Act to challenge the validity" of Aguiar's criminal conviction and sentence. (Opp'n to Mot. to Supp. at 8.) The Privacy Act permits suit for damages if an agency's violation results in a determination adverse to the individual. *See* 5 U.S.C. §§ 552a(g)(1)(C), (g)(4). However, the D.C. Circuit has held that a plaintiff may not bring a Privacy Act claim for damages if judgment in the plaintiff's favor "would necessarily imply the invalidity of his sentence," if that sentence has not been invalidated already in a separate proceeding. *White v. U.S. Prob. Office*, 148 F. 3d 1124, 1126 (D.C. Cir. 1998).

Aguiar's claims are premised on the alleged inaccuracy of the GPS data presented in his criminal trial; his claims for money damages correlate to anticipated lost wages while incarcerated. (*See* Opp'n to Mot. to Supp. at 8.) In *White*, a plaintiff challenged under the Privacy Act inaccuracies in the presentence report that had been prepared by the U.S. Probation Office, claiming that the inaccuracies resulted in a loss of eligibility for parole and thus more time in prison. *See White*, 148 F.3d at 1125. The D.C. Circuit held that *Heck v. Humphrey*, in which the Supreme Court held that a civil-rights claim for damages challenging "the fact or duration of a prisoner's conviction or confinement is not cognizable unless that conviction or confinement has been invalidated in a separate proceeding," applied to Privacy Act claims as well. *White*, 148 F. 3d at 1125-26 (citing *Heck*, 512 U.S. 477, 486-87 (1994) ("[T]he hoary principle that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments applies to § 1983 damages actions that necessarily require the plaintiff to prove the unlawfulness of his conviction or confinement.")).

Aguiar argues that Counts Four and Five are not barred under *White* and *Heck* because his claims—that the DEA and Contractor maintained and disclosed "inaccurate GPS agency records represented to be movements of Aguiar" and his car, resulting in adverse consequences for Aguiar—do not *necessarily* call into question his conviction. (Reply Mot. to Supp. at 7 (noting that Aguiar raised similar arguments about the GPS evidence in his post-conviction claims in Vermont, to no avail).) Assuming *arguendo* that this is true, Aguiar's proposed claims still hinge on the "adverse" outcome of the alleged inaccuracies—his conviction and sentence. 5 U.S.C. §§ 552a(g)(1)(C). The money damages Aguiar seeks are based entirely on his estimation of lost income due to his sentence. The inevitable conclusion is that the claims relating to the accuracy of the GPS data are in fact an attempt to use the Privacy Act to collaterally attack the

conviction and sentence, and thus *White* governs.  Counts Four and Five are not cognizable claims under the Privacy Act.[5]

Finally, Count Six alleges conspiracy "to violate the Privacy Act of 1974 and to create, disclose, and maintain inaccurate agency records" and to conceal, withhold, and destroy Aguiar's agency records.  (Proposed Supp. Compl. at 10.)  The DEA argues that this claim adds nothing to Counts One through Five except a claim of conspiracy to violate the Privacy Act, and that no such cause of action exists.  (*See* Opp'n to Mot. to Supp. at 10; *Falwell v. Exec. Office of the President*, 158 F. Supp. 2d 734, 744 (W.D. Va. 2001) ("[S]overeign immunity shields the Federal Government and its agencies from suit. . . . Accordingly, there must be statutory authorization to sue a federal agency.  Neither the Privacy Act nor FOIA provide a cause of action for conspiracy.") (citations omitted).)  Aguiar contends that Count Six does not raise a Privacy Act conspiracy claim but rather a claim of conspiracy to violate Aguiar's civil rights, but he cites no specific statutory or common-law cause of action, and the language of the claim accuses the defendants of conspiracy "to violate the Privacy Act of 1974."  The proposed supplemental complaint does not include sufficient allegations to connect these claims to a cognizable civil-rights claim.

---

[5] The DEA argues that Counts Four and Five are also barred by the two-year statute of limitations for Privacy Act claims.  *See* 5 U.S.C. 552a(g)(5).  Aguiar moved to supplement his complaint August 21, 2017; the GPS data at issue was presented during his 2011 trial.  (*See* Opp'n to Mot. to Supp. at 9; *see also* Reply Mot. to Supp. at 8 (Aguiar describing his attempts to "investigate the discrepancy between agent notes and Aguiar's electronically stored GPS tracking file").)  Aguiar contends that his attorney did not show him the GPS evidence until late 2013; the record before the Court shows that he received the spreadsheets from the DEA in March 2014 in the FOIA request process.  At least by then, Aguiar would have had all necessary information to mount these claims.  The Court finds that Counts Four and Five are thus barred by the Privacy Act's statute of limitations, are therefore futile, and for this reason as well may not be added to this litigation.

The DEA further contends that any claims against the Contractor cannot survive because the Privacy Act imposes requirements only on agencies, and "does not apply to government contractors." *Metro. Life Ins. Co. v. Blyther*, 964 F. Supp. 2d 61, 71 (D.D.C. 2013). Aguiar argues that a factual inquiry is necessary to determine whether the Contractor is an agency within the meaning of the Privacy Act, or an employee of the government. (*See* Reply Mot. to Supp. at 9.) The law, however, is clear on this question. "The Privacy Act does not apply to government contractors." *Metro. Life Ins. Co.*, 964 F. Supp. 2d at 71. For this reason alone, the proposed claims against the Contractor may not proceed.

## IV.    CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part the DEA's Renewed Motion for Summary Judgment, ECF No. 87, and grants in part and denies in part Aguiar's Motion for Partial Summary Judgment, ECF No. 88. The Court orders the DEA to make reasonable efforts within 25 days to contact Agent Couture regarding the whereabouts of the four requested administrative subpoenas and to file a declaration documenting the results of its contact with Agent Couture on or before October 22, 2018. The Court denies Aguiar's Motion for Leave to File a Supplemental Complaint, ECF No. 75.


ELLEN SEGAL HUVELLE
United States District Judge


Date:    September 24, 2018